# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH ZELLIA, | ) | CASE NO. 5:20-cv-397 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KOHL'S DEPARTMENT STORES, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court are fully-briefed cross-motions for summary judgment: Doc. No. 49, motion of defendant Kohl's Department Stores, Inc. ("Kohl's" or "defendant") (as supported by Doc. No. 49-1, brief in support) and Doc. No. 54, motion of plaintiff Joseph Zellia ("Zellia" or "plaintiff"). Zellia filed his opposition to Kohl's' motion (Doc. No. 61) and Kohl's filed its reply (Doc. No. 64). Kohl's filed its opposition to Zellia's motion (Doc. No. 62) and Zellia filed his reply (Doc. No. 65). For the reasons set forth herein, Kohl's' motion for summary judgment is granted and Zellia's motion for summary judgment is denied.

## I.      Procedural Background

On December 5, 2019, Zellia filed a complaint against Kohl's and Nick Hund ("Hund") in Stark County Court of Common Pleas setting forth two counts under Ohio state law: (1) reverse gender discrimination; and (2) retaliation. On February 21, 2020, Kohl's removed the case to this Court on the basis of diversity of citizenship, since Zellia is a resident of Ohio and Kohl's is organized under the laws of the State of Delaware and has its principal place of business in

Wisconsin; at the time, Hund had not been served, but the complaint alleged that he is a resident of Wisconsin. (*See* Doc. No. 1.)

On March 25, 2020, on Kohl's' motion, the original complaint was stricken and Zellia was granted leave to file an amended complaint, which he did on March 30, 2020. (*See* Doc. No. 13.) The amended complaint no longer included Hund as a party. Kohl's filed its answer to the amended complaint on April 13, 2020. (*See* Doc. No. 14.)

By order dated August 24, 2020, on Kohl's' motion, all proceedings were stayed and the case was administratively closed pending completion of administrative proceedings before the Ohio Civil Rights Commission ("OCRC"). (*See* Doc. No. 23.) On October 26, 2020, Zellia moved to lift the stay and reopen the case (*see* Doc. No. 24), which was granted on December 4, 2020 by non-document order.

Following the Case Management Conference on December 28, 2020, the case has proceeded according to the case management plan, as amended. The timely-filed dispositive motions are now ripe for determination.

## II.    Discussion

### A.    General Factual Background[1]

Zellia began working for Kohl's in 2007, when he was hired as a Loss Prevention Supervisor ("LPS"). (Doc. No. 48-1, Zellia Dep. at 21.[2]) He was subsequently promoted to Loss Prevention Manager ("LPM") in 2010 (responsible for four (4) stores) (*id.* at 26), and then, in

---

[1] Facts that relate more specifically to Zellia's two claims are set forth within the discussion of each claim.

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system, a citation practice recently adopted by this Court despite a different directive in the Initial Standing Order for this case.

2013, to District Loss Prevention Manager ("DLPM") (responsible for fourteen (14) stores) (*id*. at 27).[3]

Zellia's employment was terminated by Kohl's on August 1, 2019. (Doc. No. 48-1, Ex. M, Executive Counseling Form at 397–99.) The termination decision was made jointly on or before July 25, 2019 by Jolene Christensen ("Christensen"), Vice President of Associate Relations,[4] and David Ruffing ("Ruffing"), Territory Vice President of Loss Prevention. (Doc. No. 49-3, Christensen Declaration ¶¶ 1, 7; Doc. No. 49-4, Ruffing Declaration ¶¶ 1, 10.) Kohl's claims that Zellia's termination resulted from its investigation of an incident that occurred on June 26, 2019 when Zellia and one of his subordinates (who was also terminated at the same time as Zellia) violated Kohl's' Apprehension Guidelines.

On July 25, 2019, Ruffing made arrangements for Hund, who was the Regional Loss Prevention Manager ("RLPM") and Zellia's direct supervisor, to inform Zellia on August 1, 2019 of the decision to terminate his employment. (Doc. No. 49-4 ¶¶ 6, 10, 11.) Although Hund was meeting with his DLPMs, including Zellia, in Indianapolis during that week, Ruffing decided it was more appropriate to wait to terminate Zellia after the meeting when Zellia returned to his home store in New Philadelphia. (*Id*. ¶ 11.)

As will be discussed in more detail below, Zellia claims Kohl's' reason for his termination was a mere pretext for reverse gender discrimination since similarly situated female DLPMs were not terminated for the same policy violation. Zellia also claims the termination was in retaliation

---

[3] The exact dates of Zellia's promotions are unclear from the testimony in various depositions and declarations. The answer to the amended complaint gives the promotion dates as 2010 and 2013, respectively (*see* Doc. No. 14 ¶¶ 6, 7), presumably obtained by Kohl's from Zellia's employment records. Therefore, the Court is using those dates. In any event, precision as to the dates is immaterial.

[4] Associate Relations is the Human Resources function at Kohl's. (Doc. No. 49-3 ¶ 1.)

for his having complained about an incident of sexual harassment directed against him by another DLPM who was purportedly in a relationship with Zellia's supervisor, Hund.

### B.      Summary Judgment Standard

The standard for evaluation of motions for summary judgment does not change when, as here, there are cross-motions for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quotation marks and citations omitted).

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When a moving party presents evidence that, if uncontradicted, would justify summary judgment, the opposing party has the burden to show the existence of a genuine dispute of material fact." *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43, 45 (6th Cir. 2020) (citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary

4

standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted).

Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### C.    Kohl's' Challenges to Portions of Zellia's Evidence

In its brief in opposition to Zellia's motion, Kohl's objects to Doc. No. 54-6, Ex. 33, Statements from Training Attendees, which is filed in support of Zellia's motion. Kohl's argues that these unauthenticated statements do not comply with the requirements of Rule 56 or with 28 U.S.C. § 1746. (Doc. No. 62 at 3 (citing *Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir.

2009) (collecting cases)).) In his reply brief, Zellia concedes that Doc. No. 54-6 should be stricken, but points out that two of the witnesses whose statements are contained therein also submitted declarations stating practically the same things as they said in the stricken documents. (Doc. No. 65 at 1.) The Court agrees that Doc. No. 54-6 should be disregarded, although not stricken. *See Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) (documents supporting a dispositive motion are not "pleadings" within the meaning of Fed. R. Civ. P. 12(f) and are, therefore, not subject to striking; rather they are disregarded under Fed. R. Civ. P. 56). But disregarding the documents is of no consequence because the Court has found no need to consider the information contained therein.

Kohl's next argues that Doc. No. 54-16, OCRC's Letter of Determination, should not be considered for several reasons: (1) there was no completed investigation by the OCRC; (2) Kohl's sued the OCRC in state court to challenge its investigation subpoena; (3) the OCRC issued its determination letter while this state court proceeding was still pending; (4) no OCRC hearing was conducted; and (5) Zellia withdrew his charge of discrimination to pursue the instant litigation prior to any evidentiary hearing. (Doc. No. 62 at 4.) In his reply brief, Zellia argues that it is left to the discretion of this Court whether to admit this document or not. (Doc. No. 65 at 2 (citing cases outside this jurisdiction).) The Court has disregarded the OCRC's determination letter or any other information in Doc. No. 54-16, as it is all unauthenticated.

Finally, Kohl's challenges Doc. No. 54-17, EEOC Press Release. (Doc. No. 62 at 5.) Zellia has made no response with respect to this document. The document appears to be an excerpt from a blog dated February 24, 2016. It is not an official EEOC document. Doc. No. 54-17 has been disregarded as pure hearsay.

6

### D.      Reverse Gender Discrimination (Count One)

In his amended complaint, Zellia alleges that Kohl's terminated his employment for allegedly violating a company policy, while not terminating or even disciplining similarly situated female employees for the same violation. (Doc. No. 13 ¶ 45.) He claims that, at the very least, the assertion that he violated a policy is a pretext for discrimination.

### 1.      Facts Relating to Reverse Gender Discrimination Claim

Zellia's responsibilities as DLPM included training his subordinates and enforcing application of Kohl's' Apprehension Guidelines—a set of written policies and standards for the uniform apprehension of suspected shoplifters, which are designed to provide a uniform approach to apprehensions as well as to promote the safety of every Kohl's employee and customer. (Doc. No. 49-4 ¶¶ 3–4.)

In 2019, Zellia began reporting to Hund, who was responsible for approving the DLPMs' expense reports, including Zellia's. (*Id*. ¶ 6.) Hund questioned the accuracy of Zellia's claimed mileage in his expense reports and, in June 2019, began investigating. (*Id*.) To determine whether Zellia was visiting the stores as his report indicated, Hund reviewed the relevant stores' security videotapes. (*Id*.) During that review, Hund observed a videotaped incident involving Zellia that occurred on June 26, 2019 and showed him, along with LPS Curtis Gipe ("Gipe") (one of Zellia's subordinates), potentially violating Kohl's' Apprehension Guidelines. (*Id*. ¶ 8.) Hund and an employee in Associate Relations who reported to Christensen investigated the incident and kept Ruffing and Christensen informed. (Doc. No. 49-4 ¶ 7.)

The relevant videotape revealed[5] that, on June 26, 2019, while attempting to apprehend two suspected shoplifters at Kohl's' New Philadelphia, Ohio store, Zellia and Gipe violated the Apprehension Guidelines in several respects: (1) by pursuing the suspected shoplifters instead of disengaging as required after the shoplifters fled; (2) by following the suspected shoplifters beyond the 100-foot-from-entrance-doors limit set by the guidelines; and (3) by attempting apprehension despite having observed that one of the suspected shoplifters was in possession of and using a knife to open a merchandise package. (*Id.* ¶ 8; *see also* Doc. No. 49-4, Ex. A, Apprehension Guidelines & Ethical Standards at 6, *et seq.*; Doc. No. 54-3, Incident Report.)

Based on this information, on or before July 25, 2019, Ruffing and Christensen jointly made the decision to terminate Zellia's employment effective August 1, 2019, because of his multiple violations of the Apprehension Guidelines. (Doc. No. 49-4 ¶ 10; Doc. No. 49-3 ¶¶ 6–7.)

On July 25, 2019, Ruffing discussed arrangements with Hund whereby Hund would travel directly from the scheduled DLPM training session in Indianapolis (which was attended by Zellia and the other DLPMs who reported to Hund) to meet with Zellia at the New Philadelphia store on August 1, 2019, where Hund would inform Zellia of the decision to terminate his employment. (Doc. No. 49-4 ¶ 11.)[6] There is no dispute that occurred.

---

[5] A CD of the surveillance video, which was Ex. N to the Deposition of Curtis Gipe (Doc. No. 52-1), was delivered to the Court (*see* Doc. No. 49-1 at 4 n.8), but does not appear to be separately memorialized anywhere on the clerk's docket. This CD also purportedly contains Ex. C to the Gipe Deposition—three recordings made on June 26, 2019 when Gipe called 9-1-1; but these do not appear to be on the CD, although audio transcripts are attached to Gipe's Deposition. (*See* Doc. No. 52-1 at 214–225.)

[6] Gipe's employment was also terminated at the same time due to his violations of the Apprehension Guidelines. (Doc. No. 49-4 ¶ 13.)

## 2.    Analysis of Reverse Gender Discrimination Claim

Ohio Rev. Code § 4112.02(A) provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the . . . sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has found that "federal case law interpreting Title VII of the Civil Rights Act of 1964 . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. OCRC*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (same)

Absent evidence of direct gender discrimination (which is not present here), Zellia must proceed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

To establish a *prima facie* case of gender discrimination, Zellia must show that he: "1) is within a protected class; 2) suffered an adverse employment action; 3) was qualified for his position; and 4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Badertscher v. Procter & Gamble Mfg. Co.*, No. 3:08-cv-968, 2009 WL 3763083, at *6 (N.D. Ohio Nov. 9, 2009), *aff'd*, 405 F. App'x 996 (6th Cir. 2011). Where, as in this case, the plaintiff is a male, he may satisfy the first prong by "demonstrat[ing] background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (internal quotation marks and citations omitted).

9

Kohl's argues that Zellia is unable to meet his burden to establish a *prima facie* case because no comparators exit. (Doc. No. 49-1 at 11.)[7] "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[protected] employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original) (citing *Stotts v. Memphis Fire Dep't*, 858 F.2d 289 (6th Cir. 1988)). To be deemed "similarly-situated," the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation omitted).

Zellia identifies LPS Alicia Lawrence ("Lawrence") as one comparator. (Doc. No. 54 at 12.) Zellia claims that Lawrence violated the Apprehension Guidelines on June 7, 2019 by pursuing a shoplifter, who had a "folding knife" on his person, into the parking lot and beyond the 100-foot limit, but that she was given only a "verbal coaching," as shown in a July 23, 2018 email exchange. (*Id.* (citing Doc. No. 55, Ex. 11 (sealed) and Doc. No. 54-12, Ex. 12).) Lawrence is not a comparator because, although she worked in loss prevention, she was an LPS, not a DLPM, like Zellia. Lawrence's direct supervisor was not the same as Zellia's; in fact, *Zellia* was Lawrence's supervisor and it was *Zellia* who decided to give the "verbal coaching." In addition, Lawrence's standards of conduct for performance, as a subordinate, would have been lower (or at least different) than those of Zellia, her supervisor. *See, e.g.*, *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020) ("'[i]t cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the [highest

---

[7] Kohl's does not appear to challenge the other three elements of the *prima facie* case. For purposes of ruling on the dispositive motions, the Court has assumed those are established.

employee's] advisors, who are held to a higher level of professionalism and who are expected to set the standard of conduct for the [employer].'") (alteration in original) (quoting *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008)). In fact, the paperwork associated with Zellia's termination states that Zellia violated the following provision in Kohl's' Code of Ethics: "Managers have an additional responsibility to exemplify the highest standards of ethical business conduct, to lead with integrity and to create a work environment that reflects this Code. The best leaders lead by example and make themselves approachable for those who have questions or concerns." (Doc. No. 48-1, Ex. M at 397.) Moreover, Zellia does not (and cannot) explain how his July 2018 "verbal coaching" email to his subordinate (Lawrence) could possibly have anything to do with her violation of the policy that occurred *a year later* in 2019. It would be hard enough to connect the two causally if the violation had been in 2018 and the coaching in 2019, but it is impossible to find a *causal* connection when the dates are as asserted by Zellia and shown in the record.

Zellia also identifies LPS Savannah Thomas ("Thomas") as a comparator. (Doc. No. 54 at 12.) Thomas violated the Apprehension Guidelines by exceeding the 100-foot rule when she followed Hospitality Host Marie Haley into the parking lot as Haley pursued fleeing shoplifters, but was only given a "verbal coaching." (*See* Doc. No. 57, Ex. 14 (sealed).) Once again, Thomas is not a comparator because she was an LPS, not a DLPM. As with Lawrence, Zellia was Thomas' supervisor and it was Zellia who decided to give Thomas the "verbal coaching." (*Id.* at 3.)

Finally, Zellia identifies LPS Melinda (Mindy) Morgan ("Morgan") as a comparator. (Doc. No. 54 at 12–13.) Morgan attests that she "pursued [a] suspected shoplifter beyond 100 feet from the store exit" several times. (Doc. No. 54-15, Ex. 15 ¶¶ 15–17.) But Morgan has the same problems as Lawrence and Thomas—she simply does not fit the legal definition of "comparator."

Zellia is unable to establish the fourth element of his *prima facie* case of reverse gender discrimination and, therefore, fails at the first step of the burden-shifting analysis. Although this should end the analysis on the claim of reverse gender discrimination, in an abundance of caution, the remainder of the analysis will be discussed in Section F, *infra*.

### E.      Retaliation Claim (Count Two)

In his amended complaint, Zellia alleges that he was terminated from his employment because he "engaged in protected activities of reporting and opposing sexual harassment." (Doc. No. 13 ¶ 50.)[8] He claims this protected conduct was known to Hund because Zellia had "reported the harassment to Kohl's' Manager, Audrey [sic] Hostetler . . . ." (*Id*. ¶ 51.) He asserts that Hund's and Hostetler's knowledge of his protected conduct "is imputed to Kohl's." (*Id*. ¶ 52.)

### 1.      Facts Relating to Retaliation Claim

Jena Brown ("Brown"), Senior Vice President of Associate Relations for Kohl's, testified that, after Zellia was advised of his termination, she was made aware by Christensen, Brown's supervisor, that Zellia was raising "some concerns related to [his] termination as well as some additional concerns." (Doc. No. 51-1, Brown Dep. at 71–73 and Ex. 3, Brown email to Zellia

---

[8] In its motion for summary judgment, Kohl's includes a lengthy argument on what it characterizes as Zellia's claim of retaliation for "other opposition activity" based on allegations in the amended complaint that Zellia had advised his supervisor (Hund) "that he did not agree with" and "that he and his subordinates had questions about the ethicality/legality of [Hund's] newly-implemented policies," (Doc. No. 49-1 at 19; *see generally id*. at 18–21), including "setting up traps near hidden cameras to bait employees to steal; setting a limit on how many family photos were allowed in one's office; interrogating employees to see if they would admit to stealing when [he] knew they might not have stolen anything; and evaluating 'tenured hourly talent' (i.e., older employees) as a strategy to reduce payroll costs." (Doc. No. 13 ¶ 15.) The Court sees no need to address this as a separate claim because Zellia's amended complaint is clear that he is asserting only one form of "protected conduct," namely, "reporting and opposing sexual harassment." (*Id*. ¶ 50.) In addition, none but the last of the "newly-implemented policies" listed (which arguably could constitute age discrimination) appears to be anything for which an employer could be accused of retaliation and/or discrimination under the law.

12

(8/1/2019 at 3:49 PM) at 230;[9] *see also* Ex. 5, Zellia email to Randall Meadows[10] (8/1/2019 at 1:08:11 PM) at 235.) Brown advised Zellia by email that she would like to discuss his concerns. (Doc. No. 51-1 at 72.)

During his conversation with Brown on August 1, 2019, Zellia reported his disagreement with his termination based on a violation of the Apprehension Guidelines, but Brown indicated that the "termination decision would stand based on . . . all of the information we had gathered." (*Id*. at 72, 74.)

Brown further testified that, on August 2, 2019, Zellia sent her another email indicating that he had been "reflecting on [their] conversation" and wanted "to bring three other bullet points to [Brown's] attention." (*Id*. at 75–76 and Ex. 6, Email chain at 250.) Two of the three points addressed reasons for Zellia's continuing disagreement with his termination. The third point is relevant to his retaliation claim and generally sets forth allegations that he had previously been sexually harassed by two of his peers but that he "hadn't had any time to discuss this incident with Nick [Hund]." (*Id*. at 250.)

Zellia's complaint regarding sexual harassment arose from incidents on July 29, 2019 (*after* the termination decision had been made but yet not communicated) at a bar in Indianapolis called Beavers at the end of a day when Hund, Zellia, and several of Zellia's peer DLPMs, including Chrissy Miller ("Chrissy"), Allie Neuman (a.k.a. Gillis) ("Allie"), and Aubrey Hostetler had attended an out-of-town training session. (Doc. No. 48-1 at 256.) In his August 2, 2019 email to Brown, Zellia recounted the incidents as follows:

---

[9] Brown was the Associate Relations employee who assisted Hund in his investigation of the June 26, 2019 incident that led to Zellia's termination. (Doc. No. 49-3 ¶ 5.)

[10] Randall Meadows was the Senior Vice President of Loss Prevention, who was David Ruffing's supervisor. (Doc. No. 53-1, Ruffing Dep. at 25.)

> [W]hile at the bar DLPM Allie Gillis told me about an incident that involved her and Nick Hund. The incident involved former DLPM David Digman (now in AR) reporting to David Ruffing that Nick & Allie were intimate at some meeting. While she was telling me this story she started touching my chest and arms. She was very drunk and trying to flirt. I didn't think anything of it at the time but now I am wondering if it made Nick jealous. Regardless, I was very uncomfortable. This was witnessed by my peers and Nick. I eventually removed myself from the situation. I walked by two of my peers who asked if I needed "saved". The peers were Aubrey Hostetler and Chrissy Miller. I thought the conversation was over and said no. A while later I was talking to my peers. We were in a group and a female peer backed into me and grabbed my genitals. I discussed this incident with Aubrey Hostetler (it was not Aubrey who grabbed my genitals) on our drive home. I hadn't had any time to discuss this incident with Nick.

(Doc. No. 51-1 at 250; *see also* Doc. No. 48-1 at 186–87, 191.) As it later developed, Chrissy was the "female peer" who had allegedly grabbed Zellia's genitals, although Brown reported that Chrissy only recalled stepping on Zellia's foot and almost falling; Chrissy had no recollection of grabbing Zellia inappropriately, but admitted she had been drinking. (Doc. No. 51-1 at 109.) Zellia claims that he traveled by car with DLPM Aubrey Hostetler ("Hostetler") the next day (July 30, 2019) and told her he had been "uncomfortable, it was [in]appropriate, and [he] felt harassed." (Doc. No. 48-1 at 194.) Zellia did not know whether Hostetler had shared that information with anyone else. (*Id*. at 194–95.) However, Brown testified that Hostetler told her, during Brown's investigation, that Hostetler had had this conversation with Zellia the day after the incident but that Hostetler "didn't feel it was [her] place to bring things up." (Doc. No. 51-1 at 124.) Hostetler was Zellia's peer, not a supervisor of any kind. (*Id*. at 125–26.)

Although the allegations were first reported by Zellia after his termination (*see* Doc. No. 48-1 at 184), Kohl's investigated them nonetheless (*see* Doc. No. 51-1, Ex. 17, Summaries at 281) and, ultimately, Nick Hund, Chrissy Miller, and Allie Neuman (Gillis) were all terminated. (*See* Doc. No. 51-1, Ex. 18, Executive Counseling Form--Nick Hund (8/19/2019); Ex. 19, Executive

Counseling Form--Allie Neuman (8/19/2019); Ex. 20, Executive Counseling Form--Chrissy Miller (8/19/2019).)

### 2. Analysis of Retaliation Claim

To establish a retaliation claim under Ohio Rev. Code § 4112.02(1), a plaintiff must demonstrate that "(1) [he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). "If and when plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Canitia*, 903 F.2d at 1066 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802) (further citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id*. (quoting *Burdine*, 450 U.S. at 256). Further, to succeed on a retaliation claim "'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)); *see also Lisan v. Wilkie*, 835 F. App'x 831, 835 (6th Cir. 2020) (same).

Zellia argues that he has established every element of his *prima facie* case of retaliation. First, Zellia asserts that, by "report[ing] to Ms. Hostetler that Allie Gillis had touched him inappropriately, and that he felt harassed[,]" (Doc. No. 54 at 15), he engaged in protected activity. He claims that Hostetler's knowledge of Zellia's protected activity is imputed both to Hund and to

Kohl's. (*Id*. at 16.) Zellia also claims that Hund had knowledge of the sexual harassment because he was at the bar when it occurred and witnessed the incidents. (*Id*.) "Even more compelling" according to Zellia is "the temporal proximity[,]" which he argues is circumstantial evidence of Kohl's' knowledge of his protected activity. (*Id*. at 16–17.) He claims that the "stunning" temporal proximity of the sexual harassment and his reporting of it "creates an almost irrefutable inference" that his termination was in retaliation for reporting the sexual harassment to Hostetler. (*Id*. at 22.)

Kohl's, on the other hand, argues that, "[Zellia's] reports *made only after his termination* preclude his ability to show both *knowledge* by the decision makers and *causal connection* between that knowledge and his termination." (Doc. No. 49-1 at 17 (emphases in original).) Kohl's also rejects any inference that Zellia's alleged "reporting" to Hostetler was sufficient, since Hostetler was Zellia's peer, not his supervisor, and because she took no part in the decision to terminate Zellia's employment. (*Id*. at 17 n. 18.)

There are several flaws in Zellia's argument with respect to his retaliation claim. First, even accepting as true that Zellia complained to Hostetler *and* that such complaint constituted protected activity, there is *no* evidence in this record that Hostetler reported Zellia's complaint. Further, Hostetler was Zellia's peer; she had no supervisory role vis-a-vis Zellia. Therefore, her mere knowledge of protected conduct cannot be imputed to anyone higher up the chain of command absent some proof that she exercised control over someone who *was* a decision-maker with respect to Zellia's termination. *See, e.g.*, *Brewer v. Bd. of Trs. of Univ. of IL*, 479 F.3d 908, 917 (7th Cir. 2007) ("where an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her 'singular influence' over an employee who does have such power to harm the plaintiff for [protected] reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII")

16

(citation omitted). Zellia has presented no evidence that Hostetler reported Zellia's complaint to any supervisor with authority to act on it or otherwise influenced a decision-maker. In other words, there is no evidence that Kohl's had knowledge of Zellia's alleged protected conduct. *See*, *Watkins v. Sec'y Dep't of Homeland Sec.*, 401 F. App'x 461, 468 (11th Cir. 2010) (declining to impute to the employer the knowledge of a human resources employee to whom plaintiff had complained about not being promoted due to his race).

Zellia cites *New Breed Logistics*, *supra*, for the proposition that telling a fellow employee is sufficient to place the employer on notice of protected conduct. Zellia claims that courts, including the Sixth Circuit, "ha[ve] given 'great deference' to the interpretation of 'opposing' conduct as 'including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.'" (Doc. No. 54 at 15.) But both *New Breed Logistics* and one of the cases it cites — *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) — are distinguishable from the instant case. Certainly, neither case requires an employer to be a mind-reader.

In *New Breed Logistics*, the harasser was the supervisor and one of the issues was whether the terminated employees' pre-termination demands to that very supervisor that he cease his sexually harassing conduct qualified as protected activity for purposes of establishing a retaliation claim, where the supervisor was also either the decision maker who terminated the various employees or an influencer of another decision maker; the court said it did. There is nothing of that nature here.

In *Johnson*, an affirmative action official at the university claimed he was retaliated against because, as a part of his job, he opposed discriminatory hiring practices. In finding that the plaintiff

established a *prima facie* case of retaliation, the court explicitly noted that he "ha[d] established . . . that [d]efendant was aware of [p]laintiff's opposition[.]" *Johnson*, 215 F.3d at 581.

In this case, there is no evidence that Hostetler passed on Zellia's complaint of sexual harassment to anyone at all, much less did so prior to Kohl's' decision to terminate Zellia or prior to his actual termination (which termination was, undoubtedly, an adverse employment action). Therefore, Zellia has not established that Kohl's knew of any protected activity, if any even existed.

Second, Zellia asserts that Hostetler's knowledge of his complaint is imputed to Hund, Zellia's supervisor, by way of "general corporate knowledge[.]" (Doc. No. 54 at 16 (citing *Hicks v. SSP Am., Inc.*, 490 F. App'x 781, 784–85 (6th Cir. 2012); *Mulhall v. Ashcroft*, 287 F.3d 543, 552–53 (6th Cir. 2002); *Pilgrim v. McGraw-Hill Cos., Inc.*, 599 F. Supp. 2d 462, 483 (S.D.N.Y. 2009)).[11]) But in two of these cited cases, the courts found that prior interaction between people with knowledge of protected conduct and the persons who made the termination decisions was sufficient to infer that it was highly probable that those with knowledge had communicated to those with decision-making authority. The third case is not controlling in this circuit but, in any event, makes clear that "a significant participant in the decision-making process" had actual knowledge of the protected conduct of each of the plaintiffs.

Here, even if one accepts Zellia's claim that he complained to Hostetler and that she likely told Hund, their supervisor, since Hund was not the decision-maker when it came to Zellia's employment and since there is no record evidence that he communicated to the decisionmakers anything that Hostetler may have told him or that he otherwise had any influence on the termination

---

[11] Zellia also cites and discusses numerous other cases from other jurisdictions, which are not controlling precedent—especially when Zellia's claims are brought under *Ohio* law.

decision, that assumption offers no help to Zellia. Further, there is zero evidence in this record to connect Hostetler herself to either decisionmaker (Ruffing or Christensen). Therefore, Zellia still cannot establish knowledge on the part of Kohl's.

Third, Kohl's has presented undisputed testimony that Hund, Zellia's supervisor, whom Zellia claims terminated his employment out of jealousy that his "paramour" was flirting with Zellia at the bar in Indianapolis during the out-of-town meeting, was not one of the termination decisionmakers. Ruffing and Christensen have attested that they jointly made the decision to terminate Zellia and that Hund was not involved, other than to be the one to inform Zellia of the decision. Zellia has presented nothing to rebut that testimony.

Finally, Ruffing and Christensen both attested that the decision to terminate Zellia's employment was made on or before July 25, 2019, and that it would be communicated to him on August 1, 2019, when he returned to work from the out-of-town meeting. Even assuming that Zellia's complaint to Hostetler was a timely and adequate instance of protected activity, and that Kohl's had knowledge of it, the termination decision had already been made and, therefore, Zellia cannot establish causation. Although Zellia tries to rely on temporal proximity to raise an inference of retaliation, "standing alone, temporal proximity generally is insufficient to establish causation." *Lisan*, 835 F. App'x at 835 (citing cases). At the very least, to establish an inference of causation, the timing would need to be in the right *order*, with the protected conduct occurring *prior to* the termination decision.

Zellia has failed to establish the first, second, and fourth elements of a *prima facie* case of retaliation and, therefore, fails at the first step of the burden-shifting analysis. Although this should end the analysis on the claim of retaliation, in an abundance of caution, the remainder of the analysis will be discussed in Section F, *infra*.

### F.     Legitimate Non-Discriminatory/Non-Retaliatory Reason *and* Pretext

The Court has determined that Zellia has failed to establish a *prima facie* case of either reverse gender discrimination or retaliation. But, even assuming that he had established one or both (so as to create a presumption of discrimination and/or retaliation), "the burden shifts to the defendant to offer a legitimate, non-discriminatory [and/or non-retaliatory] reason for the adverse employment action at issue." *Leadbetter*, 385 F.3d at 690 (citations omitted). "If the defendant meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Id*. To meet the burden of showing pretext, "the plaintiff must come forward with evidence that the defendant's reason for the employment action is false." *Id*. (citing *Sutherland v. Mich. Dep't of Treas.*, 344 F.3d 603, 615 (6th Cir. 2003)).

Kohl's has met its burden to proffer a legitimate non-discriminatory and/or non-retaliatory reason for its decision to terminate Zellia. Kohl's claims Zellia was terminated due to his several violations of the Apprehension Guidelines on June 26, 2019. The Apprehension Guidelines state at the top of the very first page that "[a]ny violation of these procedures may result in disciplinary action, up to and including termination of employment." (Doc. No. 54-4 at 6.) Kohl's' burden is one of production, not persuasion, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509–10, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), and Kohl's has met it.

Once the burden is met, the *McDonnell Douglas* framework is no longer relevant. *Id*. Zellia always retains the burden of persuasion by showing that Kohl's' reason for his termination was "a pretext *for discrimination* [and/or *for retaliation*]" which requires proof "*both* that the reason was false, *and* that discrimination [and/or retaliation] was the real reason." *Id*. at 515 (emphases in original). Moreover, "when the employer has met its burden of production 'the factual inquiry proceeds to a new level of specificity.'" *Id*. at 516 (quoting *Burdine*, 450 U.S. at 255). "At this

20

stage, the plaintiff has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him].'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Zellia can accomplish this "by proving (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [his discharge], or (3) that they were *insufficient* to motivate discharge." *Id.* (emphases in original) (quotation marks and citations omitted).

Zellia does not show that there is no basis in fact. He does not dispute that he engaged in the actions that Kohl's found were a violation of the Apprehension Guidelines, nor does he argue that violating the Apprehension Guidelines would be a legitimate, non-discriminatory reason for termination; he simply disagrees that his actions *were* violations of the policy. Zellia argues that the guidelines explicitly apply only to loss prevention *associates*, not DLPMs, because he claims to have been given the impression by Ruffing (during a training session) that he had discretion as to how the guidelines were to be implemented in an individual situation, in particular, with respect to implementation of the 100-foot rule. (Doc. No. 54 at 9–10.) But Ruffing clearly testified at his deposition that there was no such discretion and that he never made any such statement with respect to the 100-foot rule, although he had discussed discretion in other areas. (Doc. No. 53-1 at 114–15.)[12]

---

[12] Rebuttal offered by Zellia is contained in Doc. No. 54-6, which this Court has disregarded. To the textext there are also two affidavits stating that, during a June 2019 training session, Ruffing had answered questions about the discretion of the DLPM with respect to the 100-foot rule during apprehensions (*see* Doc. No. 54-7 ¶ 4 and Doc. No. 54-15 ¶¶ 7–10), not only were they specifically refuted by Ruffing during his deposition (Doc. No. 53-1 at 114, 118 (noting that the discussion related to the DLPM's discretion "in terms of after-the-fact apprehensions and evades" when the police are present and the suspect is in custody)), in the face of the complete record, these affidavits provide a mere scintilla of evidence insufficient to create a *genuine* issue of *material* fact requiring a fact-finder to make a determination. Moreover, as explained below, even if Ruffing mistakenly gave Zellia the impression that he had some discretion, and/or if Ruffing mistakenly fired Zellia for exercising that discretion, that is not proof that the real reason for the termination was discrimination and/or retaliation.

But, even if the Court were to consider this a material factual dispute between Zellia's and Ruffing's view of the facts, and if it were to take as true for purposes of this motion that Ruffing somehow (incorrectly) left Zellia with the impression that Zellia had some amount of discretion with respect to the 100-foot rule in the Apprehension Guidelines, that is not sufficient to prove that Kohl's "made up its stated reason *to conceal intentional [retaliation]*." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (alteration in original; emphasis added). To show that the stated reason had no basis in fact, Zellia must "offer evidence from which a jury could reasonably reject [Kohl's'] stated reason for . . . [terminating him], and that it used those reasons to mask its retaliation against [him]. . . ." *Id*. "If an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e., the adverse action), then the employee will not be able to establish pretext." *Id*. at 530–31 (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). This is true "even if [the employer's] conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citation omitted).

Zellia also asserts that he did not personally observe the shoplifter using a knife (Doc. No. 48-1 at 119–20), but that, in any event, he perceived the knife as a "tool" not a "weapon." (*Id*. at 129.) But there is also no dispute that the police were called—which is required by the Apprehension Guidelines when a weapon is present; this shows that Zellia knew and believed there was a weapon and, in fact, Gipe's incident report says as much. (Doc. No. 54-3 at 3 (stating that Gipe *and Zellia* "while monitoring the CCTV camera system[] . . . observed [the male suspect] . . . pull[] out a knife and cut open the packaging to 2 sets of ear buds[]").)

Further, although Zellia points to three female individuals (whom *he* supervised) who were not terminated for their violations of the Apprehension Guidelines, the fact that Zellia failed to

exercise his responsibility to terminate the employment of people he supervised when they violated Kohl's' policies does not mean that Zellia's supervisor was required to be derelict in *his* duty when he (almost accidentally) discovered Zellia's (and Gipe's) violation.

Zellia argues that the reason given by Kohl's is a pretext for discrimination and/or retaliation because (1) Kohl's allegedly made no mention of the June 26, 2019 incident at any time between that date and Zellia's termination; (2) the length of time between the incident and Zellia's termination—five weeks—raises an inference of pretext; (3) the exceedingly short proximity in time between Zellia's "report" of harassment and his termination establishes the requisite nexus; (4) there is no documentation of the June 26, 2019 incident in his personnel file, which would be expected if the incident was serious enough to result in termination; (5) Kohl's' different treatment of female loss prevention personnel as compared to Zellia raises an inference of pretext; (6) Kohl's' asserted reason is a *post hoc* justification and evidence of pretext; and (7) Kohl's subsequently fired Hund for mishandling the sexual harassment incident. Zellia offers not a single authority for any of these arguments, except to cite one distinguishable Seventh Circuit case in a footnote.[13]

All of Zellia's arguments amount to little more than unsupported conjecture and suspicion, belied by the equally undisputed fact that Gipe was also fired for the same behavior—showing that Kohl's took the Apprehension Guidelines seriously and considered violation of the guidelines

---

[13] *See* Doc. No. 54 at 25, n. 9 (citing *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681 (7th Cir. 2007) for the proposition that the employer's delay in addressing its alleged concerns undermined its claim that plaintiff's behavior was unsafe or severe). In *Peirick*, a female coach (fired after thirteen years of employment) claimed sex discrimination. The employer asserted she was fired for unprofessional conduct, including foul language directed at her teams, poor driving on team trips, and complaining about the administration. But the court found that the university's delay in addressing such conduct, about which it was aware and had even received parental complaints, "undermines its claim that Peirick's behavior was unsafe or severe." *Peirick*, 510 F.3d at 692. Here, Kohl's was not aware of Zellia's June 26, 2019 violation of the Apprehension Guidelines until Hund discovered it while viewing store security tapes during his unrelated investigation into Zellia's expense reports.

grounds for termination (as expressed right on the first page of the guidelines). It is not the role of this Court to "act as [a] super personnel department[] to second guess an employer's facially legitimate business decisions." *Lee v. City of Columbus, OH*, 636 F.3d 245, 258 (6th Cir. 2011) (quotation marks and citation omitted).

"[T]he question before the court is not whether the employer *would have been* justified in firing the plaintiff for [his] conduct; the question is whether *in fact*, the plaintiff's firing was . . . motivated [by discrimination or retaliation]." *Jones v. Continental Corp.*, 789 F.2d 1225, 1233 (6th Cir. 1986) (emphasis in original). This record is completely devoid of any facts showing that Kohl's' true reason for Zellia's termination was either gender discrimination or retaliation.

Thus, Zellia has failed in his burden of showing that Kohl's legitimate reason for his termination was a pretext for reverse gender discrimination and/or retaliation for engaging in protected conduct.

## III.    Conclusion

For the reasons set forth herein, the motion for summary judgment filed by defendant Kohl's Department Stores, Inc. (Doc. No. 49) is granted and the motion for summary judgment filed by plaintiff Joseph Zellia (Doc. No. 54) is denied. This case is closed.


**IT IS SO ORDERED**.

Dated: March 31, 2022

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

24